## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SALIX CAPITAL US INC. on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; BARCLAYS BANK PLC; BNP PARIBAS S.A.; CITIGROUP, INC.; CITIBANK, N.A.; CREDIT SUISSE GROUP AG; DEUTSCHE BANK AG; GOLDMAN, SACHS & CO.; HSBC BANK PLC; HSBC HOLDINGS PLC; HSBC BANK USA, N.A.; INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION; J.P. MORGAN CHASE & CO.; J.P. MORGAN CHASE BANK, N.A.; MARKIT GROUP LTD.; MORGAN STANLEY BANK N.A.; THE ROYAL BANK OF SCOTLAND GROUP PLC; ROYAL BANK OF SCOTLAND PLC, and UBS AG, <br><br> Defendants. | **13 CV 6116** <br><br> Civil Action No.: <br><br> Judge <br><br> Magistrate Judge <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS** <br><br> **JURY TRIAL DEMANDED** |



## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION .................................................................................................1

JURISDICTION AND VENUE .............................................................................................6

THE PARTIES.........................................................................................................................7

    A.    Plaintiff ...........................................................................................................7

    B.    Defendants .....................................................................................................9

BACKGROUND ON THE CDS MARKET .........................................................................16

    A.    CDS Contracts Generally.............................................................................16

    B.    CDS Market Structure...................................................................................18

    C.    CDS Market Size and Concentration ..........................................................19

    D.    Limited Transparency for Buy-Side of the CDS Market..............................22

    E.    Counterparty Clearing...................................................................................23

    F.    The CDS Market Was and Remains Largely Unregulated ...........................23

DEFENDANTS' WRONGDOING ......................................................................................24

I.    DEFENDANTS JOINTLY BENEFIT FROM THE INFORMATION
ASYMMETRY PRESENT IN OVER-THE-COUNTER MARKETS...........................24

    A.    The Information Asymmetry At Issue ...........................................................24

    B.    The Impact of Such Asymmetry in the Market for CDS...............................28

II.    DEFENDANTS' WRONGFUL ACTS TO ENSURE THE INFORMATION
ASYMMETRY THEY BENEFITTED FROM CONTINUED TO BE A
HALLMARK OF THE CDS MARKET THEY DOMINATED ....................................32

    A.    Defendants Jointly Prevented Creation of a CDS Exchange and a Robust
Clearinghouse Rival......................................................................................32

    B.    Defendants' Licensing Delays Allowed Them to Create Their Own Non-
Exchange Clearinghouse, As to Control the Flow of Information ..............35

    C.    The Dealer Defendants Bully Other Rivals Out of Providing Better Real-
Time Information ...........................................................................................38

i

D.      Defendants Unreasonably Restrict Who Can Clear Trades, Further
        Lowering Competition ......................................................................................40

III.    GOVERNMENT INVESTIGATIONS .........................................................................42

IV.     OTHER MATTERS..........................................................................................................45

        A.      Class Action Allegations...............................................................................45

        B.      Inquiry Notice, Equitable Tolling, And Fraudulent Concealment...........48

        C.      Interstate Commerce .....................................................................................50

CLAIMS FOR RELIEF .........................................................................................................50

        CLAIM I ....................................................................................................................50

        CLAIM II ...................................................................................................................53

        CLAIM III..................................................................................................................54

        CLAIM IV ..................................................................................................................54

DEMAND FOR JUDGMENT..............................................................................................55

JURY DEMAND......................................................................................................................56

Plaintiff Salix Capital US Inc. ("Plaintiff"), as assignee of (1) FrontPoint Relative Value

Opportunities Fund, L.P. ("FRV"), FrontPoint Volatility Opportunities Fund GP, L.P. ("FVO

GP"), FrontPoint Volatility Opportunities Fund, L.P. ("FVO"), and FrontPoint Partners, L.P.

("FPP") (collectively, "FrontPoint," the "FrontPoint Funds," or the "Funds"), individually and on

behalf of all persons and entities who entered into a buy or sell Credit Default Swap ("CDS")

contract directly with one or more of the Dealer Defendants in the United States during the

period from January 1, 2008 to the present ("Class Period"), brings this antitrust class action for

treble damages and injunctive relief under the laws of the United States against Defendants and

alleges as follows:

## NATURE OF THE ACTION

1.      This action concerns an anticompetitive scheme by Defendants to maintain their

dominance over the CDS market by conspiring to prevent the development of alternative market

systems that would end their ability to benefit from their stranglehold on the flow of information

for the prices of CDS.

2.      CDS are bilateral contracts that transfer a credit exposure on a specific "reference

entity." The buyer of a CDS makes periodic payments to the seller in exchange for the seller's

agreement to make a positive payoff to the buyer when/if a "credit event" occurs. CDS are

generally used either (a) to hedge an investment in the underlying reference entity, or (b) to take

a "long" or a "short" position on credit risk as part of an investment strategy.

3.      The CDS transactions at issue in this Complaint involve investors (*e.g.*, hedge

funds, insurance companies, money managers, pension funds, smaller banks, and other non-

dealers) transacting directly with a CDS dealer operating as a market maker in the United States

(both for domestic and foreign CDS). The dealer-side of such transactions is dominated by the

Dealer Defendants here,[1] who account for roughly 95% of the CDS market.[2] One study using a commonly accepted measure of market concentration (the Herfindahl-Hirshman Index, or "HHI") found that the CDS market had a HHI value significantly exceeding the level at which the Department of Justice ("DOJ") considers a market to be "concentrated."[3]

4.      When financial instruments are traded on an exchange or on another electronic platform, transactions flow through a third-party that often makes public in near real-time what people are willing to buy for (the "bids"), what people are willing to sell for (the "asks"), and the price at which transactions are actually closing. In contrast, in a bilateral or over-the-counter ("OTC") regime, as seen with CDS, critical trading information may be known only to the parties to the specific contract being negotiated. Here, because the Dealer Defendants were involved in nearly all of the CDS contracts at issue, the CDS market was transparent to them, even as it was opaque to investors like the FrontPoint Funds.

5.      The Dealer Defendants profited from this information asymmetry by, among other things, maintaining artificially high bid/ask spreads. The bid/ask spread is the difference between the "bid" price at which the Dealer Defendants bought the CDS and the "ask" price at which they sold the CDS.[4] Market makers like the Dealer Defendants make money based in part

---

[1]  These Dealer Defendants are Bank of America, Barclays, BNP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, RBS, and UBS.

[2]  *See, e.g.,* Office of the Comptroller of the Currency, U.S. Dep't of the Treasury, *Quarterly Report on Bank Derivatives Activities, available at* http://www.occ.treas.gov/topics/capital-markets/financial-markets/trading/derivatives/ derivatives-quarterly-report.html.

[3]  Donald R. van Deventer, *The Credit Default Swap Market and Anti-Trust Considerations,* Blog Entry, Jan. 19, 2012, *available at* http://www.kamakuraco.com/Blog/tabid/231/EntryId/371/The-Credit-Default-Swap-Market-and-Anti-Trust-Considerations.aspx.

[4]  The bid/ask spread should not be confused with the CDS spread, which is the price paid for the CDS itself.

on this bid/ask spread, *i.e.*, by selling an instrument at a price higher than the price at which they bought it.

6.  Such can be roughly analogized to a currency exchange service that makes money by converting dollars to pesos at a different rate, even at the same exact time, from which it is willing to convert pesos to dollars. The difference in the two rates would, as multiple transactions occurred over time, essentially represent a fee for standing between two parties that have opposite needs, but who could not themselves find each other in order to do the deal directly.

7.  By keeping the CDS market opaque from the investors' perspective, Defendants were able to keep the gap between what they were willing to buy CDS protection on the spot for and what they were willing to sell CDS protection on the spot for unnaturally large. A more transparent system – and especially an exchange-based system where the number of "market-makers" was not tightly controlled to just the Dealer Defendants' small circle – would have led to a narrowing of the bid/ask spread, even if the midpoint between what two independent market participants were willing to accept to buy and sell remained the same.

8.  Bid/ask spreads – and hence the Dealer Defendants' profits – would have shrunk as the Dealer Defendants faced more competition in their role as market maker. It was those supracompetitive profits, created by artificially wide bid/ask spreads, that harmed Plaintiffs and the Class. Those spreads were charged every time Plaintiff and the Class entered into a CDS contract with the Defendants, either by way of the Dealer Defendants paying investors that wanted to sell protection less than they would have in a competitive market, or by way of the Dealer Defendants getting paid by those that wanted to buy protection more than they would have in a competitive market. Thus, both buyers and sellers of CDS were harmed by

3

Defendants' efforts to keep the bid/ask spreads artificially wide, even as to CDS with substantially identical terms and conditions.[5]

9.      As discussed herein, Defendants worked together to prevent the CDS market from moving towards an exchange-based system to ensure that they could continue jointly to enjoy these supracompetitive profits. They did this by conspiring to keep real-time information about bids, asks, and closed transactions within their exclusive control or the control of their captive provider (Defendant Markit) and then refusing to license that information in ways that would allow the information to be disseminated in a transparent fashion to investors, including Plaintiff and the Class, or that would allow the market to move towards an exchange-based system.

10.     Markets that are epitomized by price transparency and exchange-based transactions are known for having higher liquidity and lower "bid/ask spreads." On the other hand, markets that trade OTC are known for having lower liquidity, fewer participants, and higher spreads. Studies, including those undertaken by Plaintiff in preparation for this action, have found that moving from OTC to an exchange-based system can lower the bid/ask spread by as much as 75%. The threat of such a reduction in the Dealer Defendants' profit margins drove them jointly to prevent the development of price-transparency and exchange-based CDS systems. But for Defendants' wrongful conduct, the prices Plaintiff and other Class members paid for CDS protection would have been much lower and the prices they received when they sold CDS protection would have been much higher.

11.     During the Class Period, the FrontPoint Funds were significant investors in the CDS market. The Funds used single name CDS and index CDS to implement their investment

---

[5]   More specifically, sellers of CDS protection were harmed by receiving a premium that was lower than what they would have received in a more competitive market while buyers of protection were harmed by paying a premium that was higher than what they would have otherwise paid in a more competitive market.

strategies.  They actively participated as buyers of CDS as well as sellers of CDS in order to take

credit exposure to the reference entities or to hedge such exposures.  They would also, at times,

assume a contrarian view by "shorting the market" or by implementing trading strategies

designed to capitalize on the difference in prices between different reference entities or indices or

both.

12.     During the Class Period, the FrontPoint Funds traded CDS with an aggregate

notional value in excess of $30 billion across almost 400 transactions, both as buyer of CDS as

well as seller of CDS.  These transactions were concentrated in index CDS and relatively

balanced between buying and selling:

| In USD billions | Buy CDS | Sell CDS | Total |
|---|---|---|---|
| Index CDS | $11.9 | $11.9 | $23.8 |
| Single Name CDS | $2.7 | $3.7 | $6.4 |
| Total | $14.6 | $15.6 | $30.2 |

13.     Plaintiff and the Class suffered substantial injury due to the anticompetitive

effects of Defendants' misconduct.  The Dealer Defendants' actions were directly responsible for

(a) inflated transaction costs (via high bid/ask spreads), and (b) market illiquidity caused by a

large number of smaller end users who were prevented from transacting in CDS due to the high

operational costs and high collateral margin requirements.  If CDS had been traded on an

exchange and centrally cleared, Plaintiff and the Class would have had access to transparent

price information and there would have been greater competition among dealers, including the

Dealer Defendants.

14.     In July 2009, the Antitrust Division of the DOJ opened an investigation into

"anticompetitive practices in the credit derivatives clearing, trading, and information services

industries," which remains ongoing.  Similarly, in April of 2011, the European Commission ("EC") – the antitrust authority of the European Union ("EU") – stated that it was also investigating Defendants' anticompetitive conduct in the CDS market.

15.     On July 1, 2013, the EC announced its preliminary conclusion – through a "Statement of Objections" – that Defendants engaged in anticompetitive behavior in boycotting two would-be competitors from making CDS available on exchanges.  As stated by the EC's Vice President in charge of the investigation: "[The Dealer Defendants] delayed the emergence of exchange trading of these financial products because they feared that it would reduce their revenue."[6]

## JURISDICTION AND VENUE

16.     Plaintiff brings this action under Sections 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries that Plaintiff and the other Class members have suffered from Defendants' violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2).

17.     This Court has subject matter jurisdiction over this action pursuant Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26) and pursuant to 28 U.S.C. §§ 1331 and 1337(a).

18.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because during the Class Period, all the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or

---

[6]  Press Release, European Commission, Statement on CDS (credit default swaps) investigation (July 1, 2013), *available at* http://europa.eu/rapid/press-release_SPEECH-13-593_en.htm.

omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

19.     This Court has personal jurisdiction over each Defendant, because each Defendant: transacted business throughout the United States, including in this District; bought and sold CDS to Class members throughout the United States, including Class members residing or located in this District; had substantial contacts with the United States, including in this District; and/or committed overt acts in furtherance of their illegal scheme and conspiracy in the United States. In addition, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

20.     The activities of Defendants and their Co-Conspirators were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

## THE PARTIES

### A.     Plaintiff

21.     Plaintiff Salix Capital US Inc. ("Salix") is a corporation organized under the laws of the State of Delaware with its principal place of business in New York, New York. Salix brings claims as assignee of the FrontPoint Funds pursuant to the terms of an Amended and Restated Assignment of Claim Agreement between Salix Capital US and the FrontPoint Funds:

(a)     FrontPoint Relative Value Opportunities Fund, L.P. ("FRV"), formerly known as FrontPoint Fixed Income Opportunities Fund, L.P. ("FIO"), is a limited partnership organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut. Its general partner is FrontPoint Relative Value Opportunities Fund GP, LLC, a limited liability company organized under the laws of Delaware.

(b)      FrontPoint Volatility Opportunities Fund, L.P. ("FVO") was a limited partnership organized under the laws of the Cayman Islands with its principal place of business in Greenwich, Connecticut. Its general partner was FrontPoint Volatility Opportunities Fund GP, LLC, a limited liability company organized under the laws of Delaware.

(c)      FrontPoint Volatility Opportunities Fund GP, L.P. ("FVO GP") was a limited partnership organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut. Its general partner was FrontPoint Volatility Opportunities Fund GP, LLC, a limited liability company organized under the laws of Delaware.

(d)      FrontPoint Partners, L.P. ("FPP") was a limited partnership organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut. Its general partner was FrontPoint Partners LLC ("FrontPoint Partners"), a limited liability company organized under the laws of Delaware.

22.      Plaintiff Salix Capital US is owned by three individuals who during the Class Period served as subadvisors to the FrontPoint Funds pursuant to investment management agreements. These individuals negotiated, executed, and carried out the CDS transactions at issue here on behalf of the FrontPoint Funds. Plaintiff Salix is thus not a stranger to FrontPoint, but is instead a company whose owners carried out the CDS trades at issue.

23.      As noted, during the Class Period, the FrontPoint Funds were significant players in the CDS market. They purchased CDS from and sold CDS to many of the major Dealer Defendants, including Bank of America, Barclays, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, JP Morgan, and UBS.

24.    FrontPoint's CDS trades were executed almost exclusively out of FrontPoint Partners' office in New York. Fund managers in New York were authorized to receive information, investigate possible CDS trades, and make investment decisions on behalf of FrontPoint. Defendants solicited the Funds' investments in New York, and offers for the Funds to buy or sell CDS contracts were directed to fund managers in New York. Almost all of FrontPoint's CDS contracts were negotiated and executed in New York.

B.    **Defendants**

25.    Whenever in this Complaint reference is made to any act, deed, or transaction of any entity, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

26.    Defendant Bank of America Corporation ("BAC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina and branch locations in New York, New York. Defendant Bank of America, N.A. ("BANA") is a federally-chartered national banking association with its principal place of business in Charlotte, North Carolina, and is a wholly owned subsidiary of BAC.

27.    As used herein, the term "Bank of America" includes Defendants BAC and BANA and their broker-dealer subsidiaries and affiliates, including Merrill Lynch & Co., that entered into CDS contracts with the Class, including as a dealer/market maker. During the Class Period, Bank of America bought and sold in excess of $31 trillion (notional value) of CDS, and directly sold CDS to and bought CDS from members of the Class, including Plaintiff Salix as assignee of the FrontPoint Funds. During the Class Period, Bank of America was a clearing member of ICE Clear and a shareholder of Markit.

9

28.    Defendant Barclays Bank plc is a corporation organized and existing under the laws of the United Kingdom with its principal place of business in London, England and branch locations in New York, New York. As used herein, the term "Barclays" includes Defendant Barclays Bank plc and its broker-dealer subsidiaries and affiliates, including Barclays Capital, that entered into CDS contracts with the Class, including as a dealer/market maker. During the Class Period, Barclays directly sold CDS to and bought CDS from members of the Class, including Plaintiff Salix as assignee of the FrontPoint Funds. During the Class Period, Barclays was a clearing member of ICE Clear and a shareholder of Markit. Representatives of Barclays also sit on the board of ISDA.

29.    Defendant BNP Paribas S.A. is a company organized and existing under the laws of France with its principal place of business in Paris, France and branch locations in New York, New York. As used herein, the term "BNP" includes Defendant BNP Paribas S.A. and its broker-dealers subsidiaries and affiliates that entered into CDS contracts with the Class, including as a dealer/market maker. During the Class Period, BNP directly sold CDS to and bought CDS from members of the Class. During the Class Period, BNP was a shareholder of Markit. Representatives of BNP also sit on the Board of ISDA.

30.    Defendant Citigroup, Inc. ("Citigroup") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Citibank N.A. ("Citibank") is a federally chartered national banking association with its principal place of business in New York, New York, and is a wholly owned subsidiary of Citigroup.

31.    As used herein, the term "Citi" includes Defendants Citigroup and Citibank and their broker-dealer subsidiaries and affiliates, including Citigroup Global Markets Inc., that